UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
In re:                                          :
                                                :          Chapter 11 (Confirmed)
        SULTAN REALTY, LLC,                     :          Case no. 12-10119 (SMB)
                                                :
            Reorganized Debtor.                 :
-------------------------------------------------------X

## MEMORANDUM DECISION GRANTING
## MOTION FOR SUMMARY JUDGMENT

**A P P E A R A N C E S :**

RAYMOND J. AAB, ESQ.
Attorney for the Debtor
61 Broadway, Suite 2500
New York, N.Y. 10006

LYNCH & ASSOCIATES
Attorneys for 2152 Westchester Avenue Funding, Inc.
462 Seventh Avenue, 12th Floor
New York, New York 10018

        Gary O. Ravert, Esq.
        H. Michael Lynch, Esq.
            Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

        The debtor, Sultan Realty, LLC ("Sultan") has objected to the claim of its first

mortgagee, 2152 Westchester Avenue Funding, Inc. ("Funding"). (*See Objection to Claim No. 2,*

dated July 3, 2012 ("*Claim Objection*") (ECF Doc. # 55).) The dispute concerns whether

Funding's allowed secured claim should include pre-petition and post-petition interest at the

post-default rate as well as the costs and expenses incurred by its predecessor in prosecuting a

foreclosure action. Funding has moved for summary judgment on this issue, (*see 2152*

*Westchester Avenue Funding, Inc.'s Motion for Summary Judgment with Respect to Debtor's*

*Objection to Claim No. 2*, dated Sept. 19, 2012 ("*Motion*") (ECF Doc. # 80)), and the Court

concludes that the *Motion* should be granted.

## BACKGROUND

Except as otherwise noted, the facts are derived from Funding's uncontroverted statement

of material undisputed facts.  (*See 2152 Westchester Avenue Funding, Inc.'s Statement of*

*Material Undisputed Facts in Support of its Motion for Summary Judgment*, dated Sept. 19, 2012

("*Funding's 7056-1 Statement*") (attached to the *Motion*.)[1]  Sultan owns a building located at

2152-60 Westchester Avenue in the Bronx, New York (the "Property") that houses nine tenants

and parking facilities.  (*Statement Pursuant to Local Rule 1007-2*, dated Jan. 11, 2012, at ¶ 1

(ECF Doc. # 2).)  On August 12, 2008, Sultan executed a Restated Mortgage Note ("*Note*")[2] in

the face amount of $1,350,000 in favor of Intervest National Bank ("INB").  The *Note* bore

interest at the annual rate of 6.125%, and was secured by a first priority mortgage on the Property.

(*See Mortgage Consolidation, Modification and Extension Agreement (And Assignment of Leases*

*and Rents and Security Agreement)*, dated Aug. 12, 2008 ("*Mortgage*").)[3]

Sultan was obligated to make a monthly mortgage payment in the sum of $8,250 on the

first day of each month.  (*Mortgage*, Schedule B.)   In addition, it was required to make a

monthly escrow payment, (*see id.* at § 4(a)), which was $5,890.00 during the relevant period,

(*see Levin Declaration*, Ex. D, at 1-2), or an aggregate monthly payment of $14,140.  If Sultan

---

[1]     As explained in greater detail later on, the facts set forth in *Funding's 7056-1 Statement* are deemed to be established.

[2]     The *Note* is attached as Exhibit A to the *Declaration of Mark Levin in Support of 2152 Westchester Avenue Funding, Inc.'s Statement of Undisputed Facts in Support of its Motion for Summary Judgment*, dated Sept. 19, 2012 ("*Levin Declaration*") which in turn is attached to the *Motion*.

[3]     The *Mortgage* is attached as Exhibit B to the *Levin Declaration*.

failed to pay the *Note* by the contractual maturity date or the accelerated date, the rate increased

to the Default Rate of 24% per *annum*.  (*Mortgage* at §§ 12(a), 1(d).)  In addition, in the event of

a foreclosure or bankruptcy proceeding, interest would accrue at the Default Rate during the

pendency of the proceeding and until the *Mortgage* was paid in full.  (*Id.* at § 12(a).)

The *Mortgage* included numerous other charges.  Sultan had to pay a late fee of 6% if it

was more than five days late on the Debt Service,[4] and the late fee rose to 10% if it was more

than fifteen days late.  (*Id.* at § 12(b).)  Sultan also had to pay 2% of the outstanding balance as a

"Fee Payment" computed as of the date the *Mortgage* became due.  (*See id.* at §§ 1(f)(iv), 1(g).)

Finally, upon default (and after the expiration of any cure period), and without further notice and

at the option of the Mortgagee, the entire mortgage debt, all accrued interest, the Fee Payment

and all "Additional Payments" became immediately due and payable.  (*Id.* at § 17(a).)

Additional Payments included the "costs or expenses, including reasonable attorneys fees and

disbursements, which Mortgagee may incur as a result of Mortgagor's failure to perform any of

its obligations . . . ."  (*Id.* at § 1(a).)

Section 16 of the *Mortgage* named a host of events of default, but only two need be

mentioned.  First, Sultan defaulted by failing to pay any Debt Service or Additional Payment

when due.  (*Id.* at § 16(a)(i).)  Second, Sultan defaulted by placing a junior lien on the Property.

(*Id.* at § 26.)  If either of these events of default occurred, the Mortgagee could, without further

notice, exercise all of its remedies under the *Mortgage*.  (*See id.* at §§ 16(b), 26.)

The *Mortgage* also contained a broad non-waiver clause.  INB did not waive a Sultan

breach by failing to insist on strict performance of any provision of the *Mortgage*, failing to

---

[4]    Debt Service referred to payments of principal and interest.  (*Mortgage* at § 1(c).)

exercise any remedy or accepting any payment of Debt Service.  No breach could be waived,

altered or modified except in a writing executed by the Mortgagee.  (*Id.* at § 18(a).)

## A.    Sultan's Defaults

The first default occurred over three years ago.  On or about November 23, 2009, Baron

Associates ("Baron") acquired a junior mortgage on the Property.  On or about August 27, 2010,

Baron acquired a second junior mortgage, and the two Baron mortgages aggregated $500,000.

(*Funding's 7056-1 Statement* at ¶¶ 5-7.)  In addition, in 2011, Sultan failed to make any of its

Debt Service payments on time, *i.e.*, within five days after the first of the month (the due date

plus a five day grace period).[5]  The last payment tendered and accepted was made on September

7, 2011, and was applied to the payment due July 2011.  (*Id.* at ¶ 8.)  In addition,  several of

Sultan's payments were dishonored.[6]

Relying on the defaults resulting from the failure to pay the August and September 2011

payments, (*see Levine Declaration*, Ex. E, at ¶ 12), and the filing of the Baron mortgages, (*see

id.*, Ex. E, at ¶¶ 13-14), INB commenced a foreclosure action in New York State Supreme Court,

Bronx County on September 21, 2011.  INB assigned all of its right, title and interest in the *Note*

and *Mortgage* to Funding on or about October 26, 2011.  (*id.*, Ex. F.)  The foreclosure

proceeding is still pending, but has been automatically stayed since the petition date.

---

[5]    In 2011, Sultan made the January payment on February 7 (thirty-six days late), the February payment on
March 2 (thirty-one days late), the March payment on March 29 (twenty-eight days late), the April payment on April
8, 2011 (eight days late), the May payment on June 9 (thirty-nine days late) and the June payment on July 20, 2011
(forty-nine days late).  (*Funding's 7056-1 Statement* at ¶ 8.)

[6]    These included the payments tendered on or about November 10, 2010, January 28, 2011, March 28, 2011,
May 19, 2011, July 5, 2011, July 11, 2011 and August 10, 2011.  (*Funding's 7056-1 Statement* at ¶ 9.)

**B.**     **The Bankruptcy Case**

Sultan filed its chapter 11 petition on January 12, 2012.  Roughly one month later,

Funding filed Claim No. 2 in the aggregate amount of $1,521,096.46, consisting of the following:

| Component | Amount |
|---|---:|
| Unpaid principal balance | 1,326,616.59 |
| Non-default interest from 7/1/11 to 9/15/11 | 17,379.60 |
| Default interest from 9/16/11 to 1/12/12 | 105,244.92 |
| Late Fees | 11,125.20 |
| Escrow advances | 26,535.84 |
| 2% Fee Payment | 26,532.33 |
| Legal fees and expenses | 7,661.98 |
| **Total claim** | **1,521,096.46** |

(*Funding's 7056-1 Statement* at ¶ 15.)

Sultan confirmed the *Sultan Realty LLC's Third Amended Plan of Reorganization Dated

July 13, 2012* (the "*Plan*") on the date indicated in its title.  (*Order Confirming Plan*, dated July

13, 2012 (ECF Doc. 67).)[7]  Sultan sold the Property pursuant to the *Plan* for $2,550,000.  The

*Plan* placed Funding's secured claim in its own class,[8] stated that the class was unimpaired and

provided that Funding's secured claim would be paid to the extent allowed by Bankruptcy Code

---

[7]        A copy of the *Plan* is attached to the *Order Confirming Plan*.

[8]        The *Plan* originally placed Funding and Baron in the same class — Class 2.  However, the *Order
Confirming Plan* modified the *Plan* to place Funding and Baron in separate subclasses — Class 2(a) (Funding) and
Class 2(b) (Baron).  (*Order Confirming Plan* at ¶ 1A.)

§ 506(b) in full, in cash, on the later of the Effective Date or the date on which the claim was

allowed pursuant to a final non-appealable order.  (*Plan* at §§ 2.02, 4.01.)  It is undisputed that

Sultan is solvent, and therefore, Funding's entire claim, whatever the amount, is fully secured

pursuant to 11 U.S.C. § 506(b).

## C.        The Claim Objection and Funding's Motion

This brings us to the *Claim Objection*.  In substance, Sultan contended that it had never

defaulted.  First, it made only one payment three weeks late, but the "mortgage note" allowed a

thirty day grace period.  (*Claim Objection* at ¶ 1.)  Second, "[a]s the foreclosure action was

improperly brought and had been dismissed by the State Court," (*id.* at ¶ 2), Funding is not

entitled to interest at the Default Rate or the fees and costs of the foreclosure proceeding.  (*Id.* at

¶¶ 2-3.)

At the Court's suggestion, Funding moved for summary judgment to resolve the *Claim*

*Objection*.  In addition to its pre-petition claim, Funding calculated its post-petition claim as

follows:

| Component | Amount |
|---|---|
| Default interest from 1/13/12 to 8/30/12 | $204,298.71 |
| Legal fees and expenses | $14,719.43 |
| **Total Post-Petition Claim** | **$219,018.14** |

(*Funding's 7056-1 Statement* at ¶¶ 39-40.)

The pre- and post-petition claim aggregated $1,740,114.60.  (*Id.* at ¶ 42.)  Sultan paid

Funding $1,391,520.49 on August 30, 2012; this sum represented the undisputed portion of its

claim – the principal balance and interest at the non-Default Rate.  (*Id.* at ¶¶ 21, 30.)  Subtracting

that payment, Funding maintains that it is still owed $348,594.11 as of August 30, 2012.

Sultan's opposition to the motion amplified its contention that there was no default.

According to Sultan, the Baron mortgages were unauthorized.  They were delivered by Fares Ali,

the son of the Sultan's principal Hamad Ali, without Sultan's knowledge or consent, and Fares

Ali misappropriated the proceeds.  In addition, Sultan maintained that that the *Mortgage* was

payable in arrears, and on September 7, 2011, it paid INB $14,140 on account of the August

2011 rent bill.  (*Debtor's Opposition to Motion for Summary Judgment by Westchester Avenue*

*Funding, Inc.*, dated Oct. 18, 2011 [*sic*], at 2-3 (ECF Doc. # 91).)  The non-payment of the

August bill was the event of default that triggered the acceleration and the foreclosure, and

because there was no default, Funding is not entitled to interest at the Default Rate or the fees

and expenses incurred by INB in prosecuting the foreclosure proceeding.  Next, Funding is

estopped from claiming that Sultan defaulted because it abandoned the foreclosure action after it

stepped into INB's shoes and because it accepted a payment on September 2, 2011, for the

payment due on August 2011.  (*Id.* at 4.)  Finally, Sultan's chapter 11 plan cured all of the

defaults.  Accordingly, the Default Rate cannot be allowed, and should not be enforced by a

court of equity.  (*Id.* at 6-9.)

## DISCUSSION

### A.  The Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary

proceeding by FED. R. BANKR. P. 7056 governs summary judgment motions.  "The court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[9]  The

moving party bears the initial burden of showing that the undisputed facts entitle it to judgment

as a matter of law.  *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995).

Where the non-moving party would have the burden of proof at trial, the movant may obtain

summary judgment by showing that "little or no evidence may be found in support of the

nonmoving party's case."  *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223-24

(2d Cir. 1994); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If the movant

carries this initial burden, the nonmoving party must set forth specific facts that show triable

issues, and cannot rely on pleadings containing mere allegations or denials.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see Celotex Corp.*, 477 U.S. at

324.  In deciding whether material factual issues exist, all ambiguities must be resolved and all

inferences must be drawn in favor of the nonmoving party.  *Matsushita Elec.*, 475 U.S. at 587.

The parties must cite to the parts of the record that support or undercut the assertion that a

fact is not disputed.  FED. R. CIV. P. 56(c).  Under our local rules, the movant must submit a

"short, and concise statement, in numbered paragraphs" of the undisputed material facts, BANKR.

S.D.N.Y. R. ("LBR") 7056-1(b), and the opposing party must submit a statement controverting

those material facts that it contends are disputed.  LBR 7056-1(c).  In each instance, the movant

and opposing party must include a citation to admissible evidence that supports or controverts

the undisputed nature of material fact.  LBR 7056-1(e).  The latter requirement allows the Court

and the parties to focus on what is and is not in dispute, and provides a roadmap that permits the

---

[9]      The motion is governed by the amendments to Rule 56 that became effective on December 1, 2010.
Although some language has changed, the standard for granting summary judgment remains unchanged and the
amendments will not "affect continuing development of the decisional law construing and applying these phrases." 
FED. R. CIV. P. 56 advisory committee's note (2010).

Court to go directly to the cited evidence to determine whether it supports the statement.

*Funding's 7056-1 Statement* includes citations to admissible evidence after each statement.  The burden then fell on Sultan to submit a counter 7056-1 fact statement specifically controverting any disputed assertions in *Funding's 7056-1 Statement*, but it failed to do so.  Accordingly, the facts set forth in *Funding's 7056-1 Statement* are deemed admitted, and the Court may grant summary judgment on the basis of uncontested assertions in the moving party's 7056-1 Fact Statement.  *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir. 2000); *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998).

## B.    Sultan's Undisputed Default in Payment

Funding identified a litany of late payments and bounced checks.  Sultan contends that the payment made in September 2011 was timely, but does not take issue with Funding's proof that it was late on every other payment in 2011, and concedes that "Sultan was late in paying several of the monthly mortgage payments prior to September 2011."  (*Affidavit of Hamad Ali*, sworn to Oct. 18, 2012, at ¶ 5 (ECF Doc. 90).)

Although Sultan argues that the August 2011 payment was not late, the documentary evidence demonstrates conclusively that it was never even paid.  As noted, Sultan contends that it paid the *Mortgage* in arrears, and hence, the August 2011 payment was not due until the beginning of September, and was paid on September 7, 2011.[10]  (*Id.* at ¶ 4.)  Sultan does not point to anything in the *Mortgage* that supports its position.  Instead, it relies on an INB

---

[10]    Sultan sometimes refers to a September 2, 2011 payment.  This is the date on the uncashed checks attached to Sultan's papers.  The discrepancy is immaterial.

statement dated September 12, 2011, (*see id.*, attached exhibit), that included the bill for October 1, 2011.

The statement shows that as of September 12, 2011, the "amount past due" was $28,280 or two monthly payments (*i.e.*, August and September).  By October 1, 2011, the total amount due would be $42,420, or three monthly payments (*i.e.,* August, September and October).  The statement is consistent with Funding's position, confirmed by other documentary evidence, that the September 7, 2011 payment was not applied to the amount due on August 1, 2011, but rather, was applied in satisfaction of the unpaid amount still due since July 1, 2011.  (*Levin Declaration*, Ex. D, at 5.)

Thus, Sultan was unquestionably in default with respect to the August and September 2011 payments when INB commenced the foreclosure proceeding on or about September 21, 2011.  Accordingly, Funding was entitled to charge interest at the Default Rate from that date, if not earlier, under the express provisions of the *Mortgage*.[11]  The default also triggered Sultan's liability for the payment of the legal fees and expenses relating to the foreclosure proceeding. Sultan has not contested the evidence of fees and expenses submitted by Funding.  Finally, Sultan has not specifically objected to the late charges, escrow advances and 2% Payment Fee, or explained why it should not have to pay these charges under the *Plan*.  They are independent of the occurrence of an event of default under the *Mortgage*.

---

[11]     According to its proof of claim, Funding started to charge interest at the Default Rate on September 16, 2011, five days before it filed the foreclosure proceeding.  While Sultan has disputed Funding's right to interest at the Default Rate for the reasons stated, it has never argued that Funding miscalculated the amount of default interest in its claim, or that it should have started running on a different date.

**C.**    **The Debtor's Remaining Arguments**

**1.**    **Abandonment**

Sultan has failed to raise a triable issue of fact that Funding abandoned the foreclosure

proceeding.  "Abandonment" refers to "[t]he relinquishing of a right or interest with the intention

of never reclaiming it."  BLACK'S LAW DICTIONARY 2 (9th ed. 2009).  An abandonment "may be

established by affirmative conduct or by failure to act so as to evince an intent not to claim a

purported advantage [but] should not be lightly presumed and must be based on a clear

manifestation of intent to relinquish a contractual protection."  *Fundamental Portfolio Advisors,*

*Inc. v. Tocqueville Asset Mgmt., L.P.*, 850 N.E.2d 653, 658 (N.Y. 2006) (internal quotation

marks and citations omitted).

Sultan has failed to point to any evidence in support of its contention that Funding

abandoned the foreclosure proceeding.  Sultan initially argued, erroneously, that the foreclosure

proceeding had been dismissed.  In fact, it is still pending, but was automatically stayed by the

filing of Sultan's chapter 11 case less than three months after Funding acquired its interest from

INB.  Once the bankruptcy case was commenced, Funding could not take any further steps to

prosecute the foreclosure proceeding, including substituting itself for INB, without violating the

stay.  Instead, Funding continued to prosecute its rights as a secured creditor by filing a proof of

claim.

The sale of the Property and the confirmation of the *Plan* rendered the foreclosure

proceeding moot.  Had Sultan failed to sell the Property and confirm a plan that pays Funding the

full amount of its allowed secured claim, or had the Court converted or dismissed the case,

Funding would have eventually returned to the state court to exercise (*i.e.*, reclaim) its rights and

remedies as a mortgagee through the foreclosure proceeding.  Under the circumstances, Sultan's abandonment argument is rejected as a matter of law.

### 2.    Estoppel/Waiver

Sultan maintains that Funding should be estopped from arguing that it was in default. "Under New York law, the elements of equitable estoppel are with respect to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts." *Babitt v. Vebeliunas (In re Vebeliunas*), 332 F.3d 85, 93-94 (2d Cir. 2003).  "The parties asserting estoppel must show with respect to themselves:  (1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions." *Id.* at 94.

Part of the estoppel argument rests on the theory that Funding abandoned the foreclosure proceeding, and lacks merit for the reasons discussed.  The other part of the estoppel contention centers on INB's acceptance of late monthly mortgage payments, including the September 7, 2011 payment.  Sultan has not explained how it was misled by INB's acceptance of payments due under the *Note* and *Mortgage*, or how Sultan relied upon INB's acceptance of payments. The argument implies that Sultan would not have continued to make monthly mortgage payments if INB had not accepted prior late payments or if it knew that INB intended to call the default and commence a foreclosure proceeding.  But Sultan was contractually obligated to make monthly mortgage payments, and had it failed to make them, it would have defaulted earlier and would now be compelled to pay them under the *Plan*.

Furthermore, the *Mortgage* states that after a default, "no acceptance of full or partial Debt Service during the continuance of any such breach, shall constitute a waiver of any such breach" and "no breach thereof, shall be waived, altered or modified except by a written instrument executed by the Mortgagee." (*Mortgage* at § 18(a).)  The parties never waived Sultan's breach in a written instrument signed by INB or Funding.  Accordingly, INB's acceptance of late monthly mortgage payments, including the September 7 payment that satisfied the July 2011 mortgage bill, did not waive the breach arising from Sultan's failure to make the August or September 2011 monthly payments, or estop INB or Funding from pursuing their rights and remedies based upon those breaches.

### 3.    Equity

Sultan's invocation of equity essentially comes down to a contention that the Default Rate is a penalty.  The Court dealt with this issue in *In re 785 Partners LLC*, 470 B.R. 126 (Bankr. S.D.N.Y. 2012).  Addressing the question of pre-petition interest at the default rate, the Court observed that "[a] higher default interest rate reflects the allocation of risk as part of the bargain struck between the parties, a bargain that benefits the obligor as well as the obligee," *id.* at 131, and "[e]ven where the default rate strikes the judge as high, a court cannot rewrite the parties' bargain based on its own notions of fairness and equity." *Id.* at 132.  In the end, "the agreement must be enforced in accordance with its terms," and "[t]he Debtor's appeal to equitable considerations has no place under New York law." *Id.*

Turning to post-petition default interest, the Court noted that Bankruptcy Code § 506(b) provides limited discretion to set a pendency interest rate different from the contract rate. *Id.* at 134.  "There is nevertheless a rebuttable presumption that the oversecured creditor is entitled to default interest at the contract rate subject to adjustment based on equitable considerations." *Id.*

13

However, "[t]he power to modify the contract rate based on notions of equity should be exercised sparingly and limited to situations where the secured creditor is guilty of misconduct, the application of the contractual interest rate would harm the unsecured creditors or impair the debtor's fresh start or the contractual interest rate constitutes a penalty." *Id.*.

Sultan has not identified any misconduct by INB or Funding, and since Sultan is solvent, no harm will befall its unsecured creditors if it must pay interest at the Default Rate. Furthermore, Sultan's liquidating plan did not include a discharge, (*Plan* at Art. IX), and hence, it will not receive a "fresh start." Sultan's position comes down to the argument that the 24% Default Rate must be deemed a penalty as a matter of law, but has not identified any supporting authority.

Furthermore, the cases that Sultan has cited are distinguishable. In *In re Bownetree, LLC*, No. 1-08-45854-dem, 2009 WL 2226107 (Bankr. E.D.N.Y. July 24, 2009), the debtor entered into a loan agreement that called for a 12% annual interest rate, but rose to 25% in the event of a default. The mortgage included a provision that the filing of a bankruptcy case constituted an event of default. At the time the debtor filed its chapter 11 case, there was no amount outstanding on the loan. The bankruptcy court first concluded that the *ipso facto* clause was unenforceable, and the filing of the bankruptcy petition could not trigger a default or accelerate the loan. *Id.*, 2007 WL 2226107, at *2-3.

The court also concluded that the default rate was an unenforceable penalty and its application would be inequitable. It stated that the spread between the non-default and default rates "is significant and unexplained," and the enforcement of the default rate would adversely affect the creditors of the insolvent estate. *Id.*, 2007 WL 2226107, at *4. In addition, the debtor

14

cured the default under its plan, and the cure eliminated all of the consequences of the default

and acceleration, including the default rate of interest.  *Id.*, 2007 WL 2226107, at *4-5.  Finally,

the default was technical.  *Id.*, 2007 WL 2226107, at *5.

Here, while the default rate is about four times the non-default rate, it is nevertheless the

presumptive rate, and Sultan has failed to offer any evidence, beyond the size of the Default Rate

itself, to rebut the presumption.  Furthermore, Sultan's default was not "technical;" it was a

chronic late payer, bounced checks and ultimately missed two monthly payments by the time

INB started the foreclosure proceeding.  Most important, Sultan is solvent, and the application of

the default rate will not prejudice its creditors.  Instead, "[r]educing the contract interest payable

by a solvent debtor would unfairly grant a windfall to its equity."  *785 Partners*, 470 B.R. at 134.

Lastly, for the reasons discussed below, Sultan did not "cure" its defaults under the *Plan*.

Sultan also cites *In re Northwest Airlines Corp.*, No. 05-17930 (ALG), 2007 WL

3376895 (Bankr. S.D.N.Y. Nov. 9, 2007).  There, the debtor borrowed money secured by an

aircraft.  It allegedly breached the loan agreement by failing to disclose that one of the engines

was damaged, but the lender did not call a default and allowed the debtor to substitute a new

engine.  The issue presented to the bankruptcy court was whether the debtor had to pay default

interest on the entire loan or only on the installments that were past due during the chapter 11

case.  *Id.*, 2007 WL 3376895, at * 1.

The court concluded that the debtor had not defaulted and the lender did not have the

right, therefore, to charge default interest on the entire loan.  *See id.*, 2007 WL 3376895, at *5.  It

also ruled that it would be inequitable to charge default interest on the entire loan because the

debtor had the right to substitute the engine, the lender had not called a default or accelerated the

15

loan pre-petition, and the default rate would diminish the creditors' recoveries from the debtor's insolvent estate. Finally, the court concluded that allowing default interest on the unpaid installments, providing a lien on the substitute engine and paying the lender's substantial legal fees constituted appropriate compensation. *Id.*, 2007 WL 3376895, at *6.

The *Northwest* court did not address the appropriateness of the amount of the default rate, the issue that Sultan raises here. Instead, it decided whether the default interest should accrue on the entire loan balance or only on the missed installments, an issue Sultan never raised. Furthermore, the *Northwest* court, like the *Bownetree* court, determined that the application of the default rate would be inequitable because, among other things, the debtor was insolvent and the creditors would suffer. Here, Sultan is solvent, and the creditors have no stake in the outcome of a dispute between Funding and Sultan's members. Finally, for the reasons stated, Sultan defaulted and INB accelerated the debt no later than the commencement of the pre-bankruptcy foreclosure action. (*See Levin Declaration*, Ex. E, at ¶¶ 15-16.)

The last case Sultan cites is *In re South Side House, LLC*, 451 B.R. 248 (Bankr. E.D.N.Y. 2011). There, the dispute concerned, *inter alia*, a lender's right to pre-petition interest at the default rate. The Bankruptcy Court surveyed the law and concluded that under New York law, an agreement to pay interest at a higher rate after default is an agreement to pay interest and not a penalty, and "prepetition interest that is due under an enforceable agreement will generally be allowed unless one of the exceptions in Section 502(b) applies." *Id.* at 264. The bankruptcy court held that default interest should be allowed because the loan agreements provided for it, *id.* at 265-66, and none of the exceptions to allowance under 11 U.S.C. § 502(b) applied. *Id.* at 266. Here, too, the *Mortgage* provides for interest at the Default Rate, and Sultan has not argued that any provision in § 502(b) calls for its disallowance.

16

4.      **Cure**

Sultan's final argument, raised in its claim objection and amplified in supplemental briefing invited by the Court, is that the *Plan* cured its default and returned the parties to the *status quo ante* as if there had never been a default.  It relies on 11 U.S.C. 1124(2).  Section 1124 of the Bankruptcy Code defines "impairment," and subsection (2) sets forth certain conditions regarding treatment that the plan must satisfy to leave a creditor unimpaired.[12]  Among other things, the plan must reinstate the original maturity date of the accelerated debt, cure all defaults, compensate the creditor for its damages and not otherwise alter its legal, equitable or contractual rights.   Although § 1124 is definitional and does not mention interest rates, some courts have interpreted § 1124(2) to mean that a plan that meets its definition for non-impairment nullifies all of the effects of the default and reinstates the non-default interest rate.  *E.g.*, *Florida Partners*

---

[12]       Section 1124 (2) provides:

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual  rights to which such claim or interest entitles the holder of such claim or interest; or

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

*Corp. v. Southeast Co. (In re Southeast Co.)*, 868 F.2d 335, 337-38 (9th Cir. 1989); *Great Western Bank & Trust v. Entz-White Lumber and Supply, Inc. (Entz-White Lumber and Supply, Inc.)*, 850 F.2d 1338, 1340-42 (9th Cir. 1988); *In re Johnson*, 184 B.R. 570, 574 (Bankr. D. Minn. 1995) (collecting cases); *Levy v. Forest Hills Assocs. (In re Forest Hills Assocs.)*, 40 B.R. 410, 415 (Bankr. S.D.N.Y. 1984). Other courts have disagreed, concluding that § 1124(2) does not affect the contractual right to interest at the default rate and merely nullifies the acceleration. *E.g.*, *In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y. 2004); *Hepner v. PWP Golden Eagle Tree, LLC (In re K & J Props. Inc.)*, 338 B.R. 450, 461 (Bankr. D. Colo. 2005); *see In re Frank's Nursery & Crafts, Inc.*, No. 04-15826 (PCB), 2006 WL 2385418, at * 4 (Bankr. S.D.N.Y. May 8, 2006) ("[A] plan that cures a mortgage default and de-accelerates the mortgage impairs the mortgagee's secured claim if it fails to provide for the payment of interest at the contractual default rate.")

The enactment of 11 U.S.C. § 1123(d) in 1994 adds a further level of uncertainty to the argument that compliance with § 1124(2) nullifies the default rate of interest. Section 1123(d) states:

> Notwithstanding subsection (a) of this section and sections 506(b), 1129(a)(7), and 1129(b) of this title, if it is proposed in a plan to cure a default the amount necessary to cure the default, shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

Bankruptcy Code § 1123(d) was enacted to abrogate the Supreme Court's decision in *Rake v. Wade*, 508 U.S. 464 (1993), which held that a chapter 13 debtor's plan that cured a default entitled the creditor to receive interest on the defaulted payments, including interest on interest, regardless of whether it was required or permitted by the parties' agreement or state law. *See* 7 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 1123.04, at 1123-27 (16th ed. 2012). There is conflicting authority regarding whether in light of the 1994 amendment,

18

decisions like *Entz-White*, which held that the cure reinstates the non-default interest rate, is still

good law. *See In re General Growth Properties, Inc.*, 451 B.R. 323, 327 (Bankr. S.D.N.Y. 2011)

(collecting cases).

It is unnecessary to resolve this issue in connection with the *Claim Objection* for several

reasons.  First, Sultan objected to Funding's secured claim, and Funding's motion for summary

judgment relates to that objection.  The allowed amount of its secured claim will be determined

in accordance with non-bankruptcy law, § 506(b) and other provisions of the Bankruptcy Code,

but not § 1124(2).  The latter does not bear on the allowed amount of Funding's claim, but

instead, determines whether the treatment of the class that includes Funding's claim is impaired.

Second, the *Plan* did not purport to cure any defaults or de-accelerate and reinstate Funding's

claim.  To the contrary, Sultan has always taken the position that there was no default to cure.

Third, every plan that Sultan filed, including the *Plan* it confirmed, provided that Funding would

receive the full amount of its allowed secured claim, as determined under 11 U.S.C. § 506(b), not

some different amount or treatment that would leave Funding's class unimpaired under

Bankruptcy Code § 1124(2).

Accordingly, the Court concludes that Funding is entitled to summary judgment

determining that the allowed amount of its claim includes all of the items and charges

incorporated in Claim No. 2 and set out above.  As the *Plan* is self-executing, no further order is

necessary to direct Sultan to pay the unsatisfied balance of Claim No. 2 in accordance with the

provisions of the *Plan* and the confirmation order.  Settle order on notice.


Dated:  New York, New York
        December 20, 2012


                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Court